## MASK et al *v.* THE STATE, 32 Miss. Rep., 405.

### HOMICIDE.

On application in a capital case for a change of venue on account of alleged public excitement and prejudice, it is competent for the state to examine witnesses to disprove the existence of such excitement and prejudice; and in such case the defendant has a right to cross-examine the state witnesses. Wheeler v. State, 31 Miss. Rep., 490.

In the examination of witnesses it is the general rule that the cross-examination, like the examination in chief, may be co-extensive with the issue, and not confined to matters brought out by the examination in chief. HANDY, J., dissented.

The weight and number of authorities sanction the rule that a party has no right to cross-examine a witness except as to facts and circumstances connected with matters stated in his direct examination, unless it be to open the way to impeach his credit. HANDY, J., dissenting.

In error from the circuit court of Marshall county. SCRUGGS, J.

Pleasant M. Mask was indicted as principal, in the first degree, and James Mask, Thomas Wooley, and Henry Wooley, as principals in the second degree, for the murder of Susan E. Smith. At the July term, 1855, of the circuit court of Marshall county, the three first were tried, and Pleasant M. Mask was convicted of murder and sentenced to be hung; James Mask was convicted of manslaughter in the second degree, and sentenced to the penitentiary for five years; and Thomas Wooley was convicted of manslaughter in the fourth degree, and was fined $250 and sentenced to confinement in the county jail for three months.

Before the parties were put upon their trial, or any steps were taken in relation thereto, James Mask and Thomas Wooley each moved the court for permission to sever on the trial. In support of their motions the parties severally made and read their affidavits, in which each stated that he had no connexion with the murder with which Pleasant M. Mask was charged, and that he believed that he could not have a fair and impartial trial if tried in connexion with said Pleasant M. Mask. The court overruled the motions, and refused to permit the parties to sever, to which they excepted.

Pleasant M. Mask, then, before any steps were taken for the formation of the jury, moved the court for a continuance. In support of this motion his affidavit was read, in which he stated in substance that, since the indictment was found against him,

which was during the present term of the court, he had been confined closely in jail, and had no opportunity of preparing for his defense; that he was too poor to employ counsel, and that counsel had not been employed for him by others until within the last few days; that since the indictment was found he has had not time to procure the attendance of any witness who did not reside in Marshall county; that he understands that one Jonas Smith is to be introduced as a witness against him by the state; that he has been informed, and believes, that John Robinson, who resides in Tippah county, and Frederick Hubbard, who resides in Tishomingo county, are well acquainted with said Smith's character, and have been for a long time, and that they will prove that he is unworthy of credit; that he cannot prove this fact so satisfactorily by any other witness in attendance; and that they are not absent by his consent or procurement; that he expects to have them in attendance at the next term of the court; and that this application is not made for delay, but that justice may be done.

Before the court acted on said motion, the defendant asked leave to amend his affidavit, by adding that he did not know that he could prove the facts by the witnesses therein named until the 23d day of the (then) present month, which was two days before the motion was made for a continuance. The court refused leave to amend as requested, and overruled the motion for a continuance. To all of which the defendant excepted.

The defendant, Pleasant M. Mask, then, before the special *venire* was called, or any steps taken to empanel a jury, moved the court for a change of venue. In support of this motion the defendant read his own affidavit, supported by the affidavits of five others, as required by the statute. The district attorney, for the purpose of traversing these affidavits, called several witnesses, and proposed to examine them. The defendant objected, upon the ground, that the state had no right to traverse the affidavits, and that he was entitled to a change of venue upon his *ex-parte* showing, made in pursuance of the statute. The court overruled this objection, and the district attorney then examined the witnesses in relation to such excitement and prejudice in the county against the prisoner as would prevent his having a fair

and impartial trial in Marshall county.  These witnesses testified
that there was no such excitement or prejudice against the pri-
soner as would prevent his having a fair and impartial trial in
that county, and that they believed he could have such trial.
The defendant then proposed to cross-examine said witnesses in
relation to the testimony that they had given in their examina-
tion in chief; but the court, upon the objection of the district
attorney, would not permit any cross-examination whatever of
said witnesses.  The defendant then asked each of the witnesses
" if, at the time of his arrest, and also at the time he was com-
mitted to jail on the charge for which he was then indicted, there
had not been an attempt by some of the citizens of Marshall
county to execute him by ' mob law,' and were not the officers
who had him in custody compelled to hurry him to jail to pre-
vent such execution ?"  The court refused to permit the witnesses
to answer these questions, and the prisoner excepted.

After the jury were empanelled, and during the progress of
the trial, one Jonas Smith, a witness for the state, testified that
immediately after the deceased was shot, and before the parties
had left the scene of the killing, the defendants and said Henry
Wooley (who was also indicted with them, but was not on his
trial) were near to each other—nearer than witness was to either
of them, and near enough to hear all that was said.  The district
attorney then asked witness if he heard either of the parties, at
the time they left, say anything ?  The defendants objected to wit-
ness answering the question, and the court overruled the objec-
tion and permitted the witness to answer.  Witness then an-
swered, " that he heard Henry Wooley say to his (witness's)
daughter, Sarah Jane, as he was leaving, ' If you do not hold
your mouth, I will blow your damned brains out.' "  The de-
fendants excepted to this action of the court, and also to the re-
fusal of the court to exclude said answer from the consideration
of the jury upon the motion.

In the further progress of the trial, Jane Norris, a witness for
the state, testified, that about nine o'clock of the morning of the
day on which deceased was killed by the defendants, a Miss
Wooley, and Mrs. Mask, the wife of defendant, Pleasant M.
Mask, " came along the public road by her house ; they were

going from the direction of Pleasant M. Mask's house toward old man Wooley's, and were laughing and talking; when they were opposite her house they stopped and looked towards the house, and were all in a crowd together." She was then asked by the state, " If she heard any of them say anything, and if so, what ?" To this question the defendants objected, but the court overruled the objection and permitted the witness to answer it. The witness, in reply, stated, " She heard one of the party—she does not know which—say, ' that if they did not get the d—d rascal that day, they would get him.'" To this action of the court in overruling their objection ; and also to the refusal of the court to exclude said answer from the consideration of the jury upon their motion, the defendants excepted.

In the further progress of the trial, the state introduced one Robert Walker, and examined him in relation to the locality of the various roads in the neigborhood in which the killing took place, and also in relation to the road on which he saw the defendants traveling on the evening of the killing, and the direction in which they were going; and also in relation to declarations made by them as to which of the roads they would travel. The defendants, on cross-examination of said witness, asked him, " if he had seen the wound of which the deceased died, and what was its size, nature and character ?" The state objected to witness answering said question, because he had not, in his direct examination spoken of the wound. The court sustained the objection, but stated to the prisoners, that after the state had closed her testimony they might recall said witness, make him their witness, and examine him to that point, to which ruling of the court the prisoners excepted.

In the further progress of the trial the state asked Louis Deshong, (a witness for the prosecution,) if James Norris had prosecuted Pleasant M. Mask before a justice of the peace for stealing corn, and were Smith Lyons, and the witnesses R. J. Smith and William Smith witnesses against him on that trial ? The witness answered that Mask had been so prosecuted, and that the persons named were witnesses against him.

It is necessary to state that the testimony of the state tended to show an attempt on the part of the defendants to kill or do

some injury to R. J. Smith, who was the father of the deceased, and William Smith, who was her brother, and that she was killed whilst the parties were so engaged in carrying out this enterprise, and that the quarrel was in relation to what they had said about Pleasant M. Mask stealing corn.

In the further progress of the trial, and after the state's testimony had closed, and the defendants had introduced a portion of their testimony, the defendants, James Mask and Thomas Wooley, offered to prove by Mrs. Mask, wife of Pleasant M. Mask, that there was no conspiracy on their part to do any act connected with the murder of the deceased. The state objected, and the court refused to permit Mrs. Mask to be examined for any purpose whatever. To which ruling of the court the defendants excepted. The defendants moved for a new trial, which was overruled, to which they tendered a bill of exceptions. They also moved in arrest of judgment because the jury had convicted them of different offenses. This motion was also overruled, and they excepted.

This writ of error was sued out by Pleasant M. Mask and James Mask.

*Clapp & Strickland,* for plaintiffs in error.

*H. W. Walter,* on same side.

The first error which I shall notice, grows out of the refusal by the court below to change the venue. It is found in the third bill of exceptions.

The court below not only erred in refusing to change the venue, but it committed two additional errors in order to consummate the first.

The law provides that it shall and may be lawful for the circuit court to change the venue in criminal cases, "on a sufficient showing being made by the prisoner on oath, supported by the testimony of one or more credible witnesses, that he cannot have a fair and impartial trial in the county where the offense is charged to have been committed." Pleasant Mask made that showing on oath in the very language of the statute. This oath showing was supported not only by one, but five witnesses. It was then the duty of the court below to grant the change. No discretion was allowed it. What is meant by the statute in using

the term, "sufficient showing on oath?"  Simply the affidavit of the prisoner that he believed he could not get a fair and impartial trial, and then supporting that affidavit by that of one or more credible witnesses.   This is the sufficient showing on oath, and no discretion was left to the court.   It is like the plea in the imparlance term ; whenever legal on its face it operates a continuance.   An affidavit, complying in terms with the language of the statute, and supported by other affidavits, is a sufficient showing, and the venue should have been changed; and the refusal to do this, constituted error number one, as disclosed by this bill of exception.

If this view be correct, then the court committed error number two, in permitting the affidavit of Mask to be traversed, to as great an extent as it would have erred had it permitted a hearing of a traverse of a plea, at the imparlance term.   The affidavits, like the plea, sufficient on their face, admitted of no denial then.   Suppose, however, that we are mistaken on this point, and that the court below had discretion as to the deficiency,—still these affidavits, like those for a continuance of a case, (certainly they are of a higher grade and importance,) are not traversable.   This point is too well settled by both practice and precedent to admit of a doubt.

In McDaniel v. The State, 8 S. & M., the court say that the court below could look only to the facts stated in the affidavit. Suppose however, that we may be wrong in both the foregoing opinions, and that it was a matter within the discretion of the court ; yet even this discretion can be reviewed by this court. It is true that this court will seldom interfere, yet it sometimes does, and therefore the discretion of the court below is not beyond the control of this court.   In Marshall v. Fulgan, 4 How., 216, it was held that a refusal to hear an application for continuance, was error.

In Franks v. Wanzer, 3 Cushm., 121, this court again said that, " if flagrant and manifest injustice were done by an ill-directed and capricious exercise of such discretion, we are not prepared to say that it would not be our duty to apply the corrective."   This court then reversed the judgment of the court below.

These cases at least show that this court does not regard the discretion of the court below as entirely beyond correction. How stands the case at bar? We had made the showing required by law. Of itself, and without contradiction, it was sufficient to change the *venue*, even in the judgment of the court below. This is shown by the traverse of the case we made. If our case was not sufficient, why traverse, why rebut it? and if traversed, why not permit us to avail ourselves of, and put on the record all the testimony? Why refuse a cross-examination altogether? If this court has heretofore reversed, because a judge in a civil case refused to hear an application, would they not in a case involving life, reverse, because the court refused to hear the whole of the evidence offered to support the application? Suppose, even in a civil suit, that a court would hear but part of an affidavit for continuance, would not this court, in accordance with its decision in 4 Howard, reverse it? How much more certainly would reversal follow in a matter of death! Not only did the court do this, but in the language of Franks v. Wanzer, 3 Cushm., 121, it committed flagrant and manifest injustice in refusing a cross-examination of witnesses—a judgment without a precedent since the days of Lord Jeffreys. The great test of credibility was wholly disregarded. The only safeguard against perjury was beaten down. The avenues of prejudice were open without a guard. Not only was the law, in its humanity, annulled, but the very constitution itself was assailed. It delares that the accused shall be confronted by the witnesses against him. Not merely that he shall look upon and listen to them, but that he shall use, when desired, the great test of truth, a cross-examination. Even this was denied the prisoner, Pleasant Mask, and he was forced to remain for trial in the midst of an infuriated populace, who would have respected neither his personal rights nor those of the jury, had they acquitted him. He was forced to trial in the midst of such a population; and James Mask suffered equally with the effects of that undue excitement. But we must again repeat, that the matter of changing the *venue* is one not left to the discretion of the court below; that when a showing is made by affidavit of the accused, that he cannot have a fair trial, supported by one or more competent wit-

nesses, the *satisfactory* showing is made, and the court must grant it.

Whilst this court has not directly decided whether a change of *venue* is matter of discretion, yet it has in several cases, alluded to the subject in such manner as shows it would take jurisdiction. For instance, when the *venue* is changed, the order granting it must appear upon the record. Sanders v. Morse, 3 How., 101. That after trial no objection can be taken to the order for a change of *venue.* 4 How., 90. That the affidavit for change of *venue* must be made part of the bill of exceptions. Grant v. Planters' Bank, 4 How., 326 ; and that, when a party has obtained a change of *venue,* he cannot question its regularity. Soper v. The State, 3 How., 429. But this court has gone still further ; and in Carbrough v. Yalabusha County, 3 S. & M., reversed the order of the court making the change, because that change was illegal. If this court can, for any cause, reverse, then it can, for all causes, take jurisdiction, and even though it might be a matter of delicacy to disturb the judgment below, no question is purely a matter of discretion in the circuit judge, over which this court exercises a revisionary power, *for any purpose.*

(We respectfully call the attention of the court to the fact, that the law in reference to change of *venue* in civil or criminal cases, is essentially different. In the former (Hutch., 850), the judge is required to hear evidence from both parties ; in the latter, no such permission is granted. In criminal cases, the prisoner is warring against the excitement of the populace. That populace is not permitted to be heard, and thus gratify its prejudice, the very thing the change of *venue* is to defeat. The legislature has, therefore, wisely declined giving the court the right to hear testimony from both parties in a criminal case, the populace being one party, and the prisoner another to this issue. This is here (somewhat out of place) urged in support of our second position.)

The court below erred in stopping the cross-examination of Robert S. Walker. The state asked the witness several questions as to what he had seen of defendants on the day of the killing. The defendants cross-examined as to this, and then fur-

ther asked the witness if he had seen the wound of which deceased died, and what was its size, nature, and character? This question the court told the witness not to answer, as he had not alluded to this subject on his examination in chief; and the court told the prisoners that after the state had closed its testimony, they might call the witness, *make him theirs*, and then examine him on this point.

We submit that the court erred on this point. The rule is this, viz.: "a party may cross-examine as to the *res gestæ*, though it may be new matter." In England this rule has never been questioned. It is universally recognized and supported. Morgan v. Brydges, 2 Starkie R., 314; Rex v. Brook, ib., 472; 1 Phillips Ev., 273.

The supreme court of Pennsylvania, in a case in 16 S. & R., adopted a different rule, but reversed it, and in Markley v. Swartzlander, 8 Watts & Serg., 172, employed the language above quoted. The English rule was sustained in Moody v. Rowell, 17 Pick., 490; Jackson v. Varrick, 7 Cow., 283; Fulton Bank v. Stafford, 2 Wend., 483. The rule is universal in England and equally so in the state courts in this country. The supreme court of the United States is the only exception. The answer to this question might have been highly important. It certainly was pertinent to the issue. One of the witnesses says the deceased died of that wound. Walker could have proved its character, and then proof would have been admissible, that such a wound as described could not have produced death. Proof might also have been made that the pistol of Mask was loaded with such character of shot, as could not have produced such a wound. The question was pertinent to the issue. We might have been willing to have made this proof from the witness of the state, but not from our own witness. His answer would have been conclusive on the state. As its witness, his credit could not have been impeached; as ours it might. The court below refused us this benefit, for it expressly refused permission to cross-examine him *as the witness of the state;* but said we might recall him and *make him our witness.* This was in violation of the rule as uniformly established in England, and with equal uniformity held by the *state* courts in this country;

the supreme court of the United States being the only exception.

The court erred in giving the 7th charge asked by the prisoners, *with the addition annexed.* The charge asked for was that " the jury must be satisfied from the evidence and the evidence only, that a conspiracy existed, and they cannot infer it from any thing not in proof before them." This unquestionably is law, but the court added the following, viz. : " A conspiracy does not imply a previous meeting and formal agreement of the parties. It is sufficient if they were present with a common felonious intent."

Our legislature has declared that for the better preservation of the sanctity of the trial by jury pure and uninfluenced, no judge " shall charge the jury on points or principles of law, applicable to the case before them, unless the parties to such issue or their counsel differ in opinion as to the same ; or one of the parties or counsel shall ask the charge of said judge to be given upon some point in controversy in said issue, which shall be distinctly specified in writing by the party asking such charge ; and the judge shall charge no other point than that to which his opinion is required." Hutch. Code, 888. Such is the law, and in making additions to the 7th, 9th, and 10th charges of defendants, the court violated this law. As the 7th charge was the first to which the court below made an addition, we will confine our remarks to it, and these remarks will be applicable to all the additions to the other charges.

The 7th charge is unquestionably sound law. There was no issue in the court below as to its legality. The court should have given it. In the next place, the charge was distinctly reduced to writing, and should have been given or refused. In the last place, the jury were by the instruction told that they could only regard the evidence in the case. This was the point in the charge, and yet the court below told the jury what constituted conspiracy, and thus charged on a point " to which his opinion was not required." In civil cases, (Hutch. Code, 891), the law permits the court to add in writing a charge. This is applicable to civil cases only, but in criminal cases, " for the better preservation of the sanctity of trial by jury pure and un-

influenced," the court shall not charge. It is true that this court (*obiter dictum*) said in Bowles v. The State, 9 S. & M., 284, that the judge is not bound to give or refuse the charge in the precise terms asked by counsel, but may modify the charges asked on both sides, so as to make them conformable to its own views of the law. We respectfully submit that this was an unguarded remark by this court, (it was certainly not pertinent to the point under consideration,) and is not law. It might be true in a civil, but not in a criminal case. Concede for argument's sake that this may be true in criminal cases. The *dictum* is, that the court may *modify* the charge. This is all—*modify*. What modification to the 7th charge is the addition to it? The charge is, that the jury can look to the evidence only in forming their verdict. The addition tells the jury what a conspiracy is. The charge tells the jury the range of their investigation; the addition tells them what the law terms a conspiracy. It is as much a modification as the change of a dwelling-house to a steamboat would be.

This very addition is fully embraced in the charges of the state, and if the course pursued by the court below is tolerated, a prisoner can be crucified by having the state's charges *seriatim*, tacked on each of his charges. The purity of trial by jury would be fearfully tarnished.

We respectfully submit, that the fifth charge given by the state is too broad, and was calculated to mislead the jury. It allows nothing for human passions. The insult by words may be such, for a moment, as completely to unsettle the judgment, and would reduce the killing to manslaughter.

Again, the court below erred in giving the ninth charge asked for by the state, and in refusing to arrest the judgment. The charge, and the refusal to arrest, present the same error. The whole case, as to James Mask and Thomas Wooley, is based on their conspiracy to commit a felony on R. J. Smith, the brother of the deceased. The admission of the testimony of Mrs. Norris, and of L. Deshong, was permitted. If the conviction of James Mask and Thomas Wooley, did not follow from conspiracy, then this testimony was clearly illegal. But the whole case, as to them, was based on the fact, (as attempted to

be established,) that a conspiracy did exist to commit a felony on R. J. Smith. As co-conspirators then, the court could not charge that one of them could be acquitted, one found guilty of one offense, and the third of a still different one. The court having charged this, and the jury having found them all guilty of different offenses, the judgment should have been arrested. It is certain, that neither James Mask nor Thomas Wooley did the act that produced death. How, then, were they responsible? By entertaining a criminal intent in common with Pleasant Mask for an offense not committed, (the injury to R. J. Smith,) and the act of Pleasant, in committing another act, not contemplated by them, viz.: the killing of Miss Smith. The criminal intent is one part of the offense, the commission of the act another. The criminal intent was nothing; but became a grave offense when consummated by the act of their co-conspirator. How is it possible, then, that mere co-conspirators, not themselves acting, can be guilty of a different offense from the actor? How can one be acquitted, another be found guilty of one offense, and another, still, of a different one? The criminal intent is the power of attorney by which the agent acts. This delegated power is general, and binds the principal to the full extent in all acts committed under it. And yet the principal, under this charge, may be bound for nothing, or for a part of the act, or for the full act. This will not do. The criminal intent is the power by which the principal is bound for the whole conduct of the actor, or he is bound for nothing. As there is no agency in crime, but all are alike bound or alike free, you cannot say to the actor, you are guilty of one offense, and to the co-conspirator, you are guilty of another. The doctrine of relation or privity in the act applies to all. The same offense could not be murder in Pleasant Mask, and but manslaughter as to the others. His act bound them—his act was theirs. It is impossible, therefore, that this act, as to him, could be murder, as to them, manslaughter.

*H. H. Chalmers*, for the state.

This is an appeal from the circuit court of Marshall county, where the plaintiffs before this court were indicted, together with Henry and Thomas Wooley, for the murder of Susan Elizabeth Smith.

Henry Wooley, before the finding of the true bill, fled to parts unknown, and made his escape. Thomas Wooley was convicted of manslaughter in the fourth degree; sentenced to three months in the county jail, and has already served out his time. Pleasant M. Mask and James Mask, his brother, were convicted respectively of murder and manslaughter in the second degree, and sentenced accordingly. From that verdict and judgment, they have taken their appeal to this court, and assign various errors apparent upon the record, for which they contend that they should have a new trial.

First. Because the court below refused to grant them a severance of their cases.

In overruling the prisoners' motion for a severance, I respectfully submit that the court below did not err, or even if it did, it is not such error as will entitle the appellants to a new trial. The accused assigned no cause in their motion for a severance and the affidavits accompanying it, save the general one, that they believed it would be prejudicial to their interests to be tried jointly; because, I suppose they wished to avail themselves of the testimony of each other. Was this a sufficient reason to deprive the state of the right, which she unquestionably has, to insist upon the exclusion of the testimony of one co-defendant in favor of another? And even if it were sufficient, is not the granting or the refusal of a severance a matter wholly within the discretion of the court below, and one over which this court will hesitate to take control? In the case of the United States v. Gibert et al., 2 Sum., 63, Judge Story uses the following language: "Now, this" (the granting of a severance) "has been long since settled by the supreme court of the United States, to be a matter not of right, but of sound discretion, to be exercised by the court." See also United States v. Marchant, 12 Wheat., 480. "Where the reason assigned for separate trials was, that the prisoners might use the testimony of each other in their defense, it was held that this would not justify the court in the exercise of its discretion." Wharton Criminal Law, 918, and authorities there cited.

The second error, assigned by appellants, is the refusal of the

court below to grant them a continuance of their case to the next term of the court.

This cause of error, like the first, is not one for which this court will grant a new trial. In the case of Babcock v. Scott, 1 How. (Miss.) R., 100, Judge Smith holds the following language: " I am not aware that it has ever been holden that a refusal to grant a continuance is error. This power is committed entirely to the discretion of the judge." See also Berry v. Hale, 1 How., 315 ; Wharton Crim. Law, 830.

The third error assigned by appellants is, the refusal of the court below to grant a change of venue. And this point, too, like the first and second, I submit, is a matter entirely within the discretion of the court below.

A change of venue, in criminal cases, is a thing unknown in the common law, and owes its origin entirely to statutory enactments. Upon this point our *statute*, whatever may have been heretofore the practice of circuit judges, is clear and explicit.

" From and after the passage of this act, it shall and may be *lawful* for any circuit court in this state," etc. The language used " *shall be lawful*," without doubt implies that it is left entirely to the discretion of the court below. The prisoners applied for a change of venue, because they said they could not get a fair trial in Marshall county ; and two witnesses swore that they did not believe they could.

In the exercise of the discretion entrusted to him by the statute, the court below had a half-dozen witnesses, from all parts of the county, examined, who swore that there was no undue or unusual excitement against the prisoners ; that, in their opinion, they could have a fair trial there, and that the witnesses introduced by the accused were their relations. Upon this showing, Judge Scruggs overruled the motion for a change of venue, as he had an unquestionable right, by the statute, to do.

Is this court prepared to grant the prisoner a new trial in consequence of such action ? An affidavit of one indicted for a capital offense, stating that he believed he could not obtain an impartial trial, because a subscription for his arrest was had in the district, was held, in South Carolina, not a sufficient cause for change of venue. State v. Williams, 2 M'Cord, 383.

The fourth ground of error alleged by the accused is, that the witness, Jonas Smith, was permitted to testify as to a remark made by Henry Wooley, who was not upon his trial.

Henry Wooley was one of the four persons who, in conspiracy together, as charged by the state, went to the house of the father of deceased. He was indicted, together with the other three, but made his escape. After the shooting of Miss Smith by Pleasant M. Mask, and just as the party were leaving the scene of action, he pointed his rifle at Sarah Jane Smith, who was weeping and screaming over the body of her murdered sister, and told her to "shut her mouth, or he would blow her damned brains out."

To the giving in of this testimony the defendants objected, though upon what ground it is difficult to perceive.

If there was a conspiracy among the accused, (and that there was, there is scarcely room for a shadow of a doubt,) Henry Wooley was certainly one of the conspirators, and as such, whether he was on trial or not, any acts or declarations of his, made at the time of the perpetration of the deed, are clearly admissible. Whart. Crim. Law, 261, 263.

The court is too familiar with the principle, that any act or declaration of one of the conspirators, done or said in the transaction of the preconcerted plan, is the act or declaration of all, and is evidence against all, to require more than a passing reference to it. Russell on Crimes, 510; Barbour Criminal Treatise, 228.

The fifth error, on account of which the appellants ask a new trial, is, that the witness, Mrs. Norris, was permitted to testify as to the remark overheard by her, as three of the accused, in company with two ladies, were passing her house, on the morning that Miss Smith was killed.

Mrs. Norris is the wife of James Norris, whose corn Pleasant M. Mask had been charged with stealing, about which the whole of this most unfortunate difficulty had arisen. It had been proved, that the first question asked by Pleasant Mask, when he rode up to Smith's house, was for Norris.

On the morning of that day, as Mrs. Norris was standing in front of her house, the two appellants before this court, and

Thomas Wooley, together with Mrs. Mask and Miss Wooley came along the road. In front of her house Mrs. Norris saw them pause and look towards the house, and one of them, she could not say which, remarked, "If we don't get the d——d rascal to-day, we will get him." Her husband was in sight, going towards the field, with a gun on his shoulder. We submit, that in view of the facts in the case, the testimony went properly to the jury. It was their province to determine how much weight it was entitled to. The state is attempting to prove a conspiracy, on the part of the accused, to commit a felony upon the elder and younger Smith; in the perpetration of which, Miss Smith was killed. The ground of their animosity against the Smiths was, that they had given evidence against P. M. Mask, in the corn-stealing charge, upon which he had been prosecuted by Norris. This remark, overheard by Mrs. Norris, was evidently made by one of the accused. Counsel will scarcely contend that it came from Mrs. Mask or Miss Wooley. It went directly to show a formed and expressed intention among the prisoners to do some great bodily harm to some one; the probabilities all are, that that some one was Norris or the Smiths. The jury was the proper judge of those probabilities. The evidence of a conspiracy must, from the nature of the case, be always vague and circumstantial, and to lay down a strict and arbitrary rule to the state, would always defeat the proof of one. Whart. Crim. Law, 695; Russ. on Crimes, 511; 2 Starkie Evidence, part 1, p. 330; Barbour Crim. Treatise, 228.

The defendants rely, sixthly, upon an error alleged to have been committed by the court below, in permitting the witness, Louis Deshong, to testify as to the charge of corn-stealing having been brought by Norris against Mask; and the Smiths having been witnesses upon the trial before the magistrate.

Whilst we admit, that the fact that this charge had been brought, and that the Smiths testified as to its truth, was not strictly a part of the "*res gestæ*" of the killing; yet, as establishing the fact of the malice, and giving a clue to the formation of the conspiracy, it is all-important. Without some testimony as to antecedent transactions between the parties, it would

have been difficult to show any motive by which the accused were actuated.

Malice, like conspiracy, must be inferred; and may be inferred from a great many extraneous circumstances, not directly connected with the perpetration of the deed; and with a view to show a preconceived grudge, and give a clue to the formation of the conspiracy, we submit it to the court, if the questions asked Deshong were not admissible.

The seventh cause of error assigned by the prisoners, why a new trial should be awarded them is, that the witness, R. J. Walker, was not permitted to answer a question put to him by defendants' counsel.

The witness was introduced by the state and examined as to the roads running in different directions through the country where the deed was committed. He was handed over to the accused for a cross-examination, and was asked by them, " if he had ever seen Miss Smith's wound, and what was its nature, size and character." The district attorney objected to the question, and the court sustained the objection.

All writers upon the evidence, after giving the general rules for its introduction and rejection, conclude, by giving great latitude to the exercise of the sound discretion of the courts. Many questions of a delicate nature, they leave altogether to the judgment of the presiding judge.

In 1 Monroe, 118, 119, the court, after setting forth the manner in which testimony should be introduced, go on to say : " We say *generally*, for it will often be found necessary and proper for the presiding court, for good reasons, to depart from them to attain complete justice ; and when they ought or ought not to be varied, must in a great measure be left to the sound discretion and prudence of the inferior court. And this court (an appellate court) ought never to interfere for such departure, except injustice is done by that departure."

Has any injustice been done the prisoners by the rejection of the testimony in this case ? Does it in any way affect the substantial justice of the verdict, that Walker was not permitted to speak of Miss Smith's wound ? Had not the nature, character and *effects* of that wound been already proven beyond cavil or

question ? Will this court set aside the verdict of the jury upon this ground ?

And, again, this question was asked the witness on cross-examination—was altogether a new fact, about which he had not spoken, and to which he had not alluded, and it was evidently put with a view afterwards to discredit him. The authorities upon this subject are full and explicit. " It is here to be observed, that a witness is not to be cross-examined as to any distinct, collateral fact, for the purpose of afterwards impeaching his testimony by contradicting him." Starkie Evidence, 189.

A witness cannot be cross-examined as to any distinct, collateral fact, for the purpose of afterwards contradicting him." Barbour Crim. Treat., 389 ; Roscoe Crim. Ev., 128–139.

But I take the broader position that the refusal of the court to allow the witness to answer this question, was right, because it was a question asked upon cross-examination, and having no connection with any thing deposed to by him in his examination in chief. I am not aware that this question has ever been brought before this court before ; and it is not a new one in the judicial history of the country. Barbour, in his " Criminal Treatise," p. 399, lays down the broad proposition—" The questions upon the cross-examination should all be such as arise out of the evidence given by the witness in his examination in chief, or are calculated to elicit the witness's title to credit." And the rule is now considered by the supreme court of the United States to be well established, that " a party has no right to cross-examine any witness except as to facts and circumstances connected with the matters stated in his examination in chief, and if he wishes to examine as to other matters, he must do so by making the witness his own and calling him as such in the subsequent progress of the cause." Greenleaf Evidence, 522, § 446. See also 14 Peters Reports, 461, from which Greenleaf extracts the preceding sentence. Also, 16 Serg. & Rawle, 77, where the the same doctrine is declared.

Judge Scruggs, in the court below, suggested to the defendants the very course which Judge Story, in 14 Peters, lays down as the proper one, viz., to recall the witness at a subsequent stage of the case, make him their own, and examine him as to

any thing they saw proper. They declined doing so. Will this court now set aside .the verdict of the jury and award them a new trial, because of the exclusion of evidence, which could not possibly have had any material influence upon the verdict, and which they could most easily have introduced, had they wished it?

The accused demand a new trial, eighthly, because Mrs. Mask, the wife of one of the defendants, was not permitted to testify in behalf of the other two.

The law upon this point is ample and clear. Says Greenleaf, "Nor is she, (the wife of one co-defendant,) a witness for a co-defendant if her testimony, as in the case of a conspiracy, would tend directly to her husband's acquittal." 1 Greenleaf Ev., 406, § 335.

"So upon an indictment for a conspiracy, the wife of one de-fendant cannot be called as a witness for another." Roscoe Cr. Ev., 138; also 2 Starkie Ev., part 1, p. 330; Whart. Cr. Law, 294.

The appellants assign as the ninth error on the face of the rec-ord, on account of which they should have a new trial, the over-ruling by the court below of their motion for a new trial.

Their motion was based upon several grounds, some of which have already been considered. Among the rest (merely *pro forma*, it is to be supposed), they allege that the verdict of the jury was contrary to law and evidence. I can say with safety and without fear of exaggeration, that dark as are the criminal annals of our state, such an awful and unprovoked murder as the record sets forth in this case, never disgraced them before. By its side the offenses of McCann and Dyson fade almost into in-significance. They except too to the charges of the judge. These charges are many in number, and in matter range through the whole science of criminal law. In them I see nothing ille-gal or calculated unjustly to prejudice the defendants' case. The last cause, for which they moved a new trial in the court below, was, that one Joseph Walker, the clerk of the court, and a physician by profession, administered to one of the jurors a dose of medicine without the permission of the judge. The ju-ror was taken dangerously ill with cholera-morbus in the night;

the officer in charge applied to Dr. Walker; he sent him a preparation in which it was proved there was an infusion of brandy, of which medicine the juror took a table-spoonful that night; brought it into court with him next morning, and during the argument of counsel took several more doses.

As to whether counsel for the accused mean to insist that Dr. Walker and the sheriff should have allowed the unfortunate juror to have died, without any medicine at all, or whether they would intimate that the brandy contained in it rendered him unable to render a correct verdict, I must refer the court for information to the gentlemen themselves.

The tenth and last error assigned by the accused, is the over-ruling by the court below of their motion in arrest of judgment.

This motion was based solely upon the fact, that the jury had found them guilty of different offenses.

There was certainly no error in this. By the statute in this state, a jury can find a criminal guilty of any less grade of the same offense for which he is indicted; and certainly where two men are tried jointly for the same offense, the jury can determine that one is guilty of a higher, and the other of a lower degree of crime, according to the share which each took in the perpetration of the deed.

*D. C. Glenn,* attorney general, argued the cause orally.

FISHER, J.:

This was an indictment returned by the grand jury into the circuit court of Marshall county, charging the defendants below with the murder of one Susan Elizabeth Smith.

The first error assigned relates to the defendants' application for a change of the venue to some other county of the district. The application appears to have conformed to the requisitions of the statute. The court, however, permitted the prosecution to introduce and examine several witnesses, with a view of making a counter showing, and upon hearing their testimony refused the application, to which action of the court the counsel for the defendants excepted. This point has recently been decided by this court in the case of Weeks v. The State, holding that such testimony could be introduced. But it is said that the court

erred in refusing to permit the defendants' counsel to cross-examine the witnesses. It appears by the record that the court refused any cross-examination whatever to be made. The rule on this subject is almost without exception, and is founded in both reason and the clearest principles of justice, that an examination in chief of a witness by a party, carries with it the right to a cross-examination by the adverse party; the object being to elicit the whole truth in regard to the particular subject of investigation before the court. We perceive nothing in the nature of this investigation to authorize in disregarding the rule. The witnesses doubtless intended to express nothing but an honest opinion in regard to the state of public opinion in the county; but this opinion, though potent in their estimation, might have been worth nothing in the sound and discriminating judgment of the court, when tested by the facts and circumstances brought out on a cross-examination. We are therefore of the opinion that the court erred on this point.

It is next assigned as error that the court erred in refusing to permit the counsel of the defendants to cross-examine a witness introduced on the part of the state as to matters not immediately connected with the direct examination. The witness stated, that on the day of the killing he saw the defendants in a certain road leading in the direction of the house of the father of the deceased, and that he overheard a certain conversation among the parties in relation to the road. The counsel for the defendants asked the witness on cross-examination if he had examined the wound of which the deceased died, and if so, to state its size and character. Upon objection being made, the court refused to permit the witness to answer this question, but stated to counsel that he could, at the proper time, if he so desired, make the witness his own and examine him as to this matter.

The general rule as laid down in all the elementary writers is, that the cross-examination, like the examination in chief, may be co-extensive with the issue, and that it is not confined merely to matters brought out by the direct examination. The object of the testimony was, no doubt, to form a link in the chain of evidence to establish malice or a conspiracy by the defendants; and conceding, for the sake of argument, that it could rise to

this importance, it still would be but evidence taken by itself of an intention to commit murder, and not of the actual commission of it. Now, suppose the cross-interrogatory had been answered, the size and character of the wound given, and that it had appeared from the nature of the wound that the defendants could not have inflicted it with any weapon which they or either of them had about their persons or within their reach at the time, would not the force of the testimony elicited by the state have been completely destroyed. It is the doing of an unlawful act that gives the state the right to prove an unlawful intent, and hence, if the parties were not guilty of the act itself, to wit, the homicide, or concerned with others who were guilty, though they may have intended to do the act, yet their unexecuted intention, while it may have been highly criminal, could not be treated as murder, or as any other grade of homicide. What, then, would the proof, taken as a whole, establish? The prosecution might say that we have by our testimony, taken by itself, created a presumption of malice; that is to say, an intention to commit murder. The defendants might reply, if you have, the same witness proves that we could not have committed the murder. Whatever force, then, there might be in the first presumption, it would be destroyed by the second.

The testimony thus goes to the jury as a whole, and the question is, What fact does it tend to establish? The answer is at once—none. Because the presumption of malice is rebutted by the other presumption that the parties could not have committed the deed.

We have treated the cross-interrogatory as having been answered for the purpose of illustrating the principle and of showing that, while it may frequently be convenient to confine a party to the matter embraced in the direct examination, yet it is a rule founded in good and safe policy to allow the cross-examination the same latitude which is allowed to the examination in chief. Circumstances will generally suggest to the judge presiding at the trial when there should be a departure from the rule. It is not deemed necessary to notice the conflict which is said to exist in the authorities on this subject. The conflict has no doubt arisen from the fact that courts have sometimes

misunderstood the object of a cross-examination, and have treated the testimony thus elicited as the defendant's evidence instead of treating it as a part of the testimony of the party introducing the witness. When the state introduces a witness on the stand, he is there for the purpose of telling the whole truth of the matter relevant to the issue, and whether what he states is in response to the questions propounded by the prosecution or by the defendants, it is the testimony of the state, and as such must be received, weighed, and considered by the jury. It is not the case of a confession and avoidance, for the reason that murder, when confessed, cannot be avoided except by a plea of acquittal or former conviction. Nor is it the case of a party endeavoring to prove himself innocent, but of the state endeavoring to prove him guilty; and in making this proof, he is only insisting that the witnesses shall state what they are required by their oath to state—the whole truth relevant to the issue then under investigation.

In regard to the various other questions involved in the case, we are of opinion that the court committed no error. If we were to go into an examination of each question, we would be compelled to comment to some extent upon facts which ought to be left for the consideration of the jury, untrammelled by any opinion of this or any other court, as it is their province alone to weigh the evidence.

For the reasons already stated the judgment will be reversed, and a *venire de novo* awarded.

Smith, C. J., concurred.

Handy, J., dissented, as follows:

I cannot concur in the opinion of the majority of the court upon the point of the refusal of the court below to allow the examination of the witness, Walker, proposed on the part of the prisoners, as upon cross-examination.

It appears that that witness had been called and examined by the state, and testified merely that he had seen the prisoners on the day when the killing took place, riding together, and the direction from which they came, and that one of them inquired of the others, at a particular point, which was the way to go. The prisoners thereupon proposed to interrogate the witness

whether he had seen the wound of which the deceased died, and what was its size and character? No connection between this alleged cross-examination and the statements of the witness in chief was shown or suggested, nor does it appear that the object of the cross-examination was to lay the foundation for impeaching the credit of the witness. The question presented, therefore, is, whether a witness called by one party and examined in chief upon a distinct and isolated fact, may be examined by the other party by way of cross-examination upon points not embraced in the examination in chief, but pertinent to the general merits of the case.

A difference of opinion upon this point exists between courts whose opinions are entitled to the greatest respect. In Massachusetts it has been held that a witness who has been sworn and examined as to an isolated fact, may be fully cross-examined as to the whole case. Moody v. Rowell, 17 Pick., 499. And the same rule appears to be sanctioned in England, in the case of Rex v. Brooke, 2 Stark. Rep. (3 Eng. Com. Law Rep.), 472. On the contrary, the weight and number of authorities sanction the rule that a party has no right to cross-examine a witness except as to the facts and circumstances connected with the matters stated in his direct examination, unless it be to open the way to impeach his credit. Harrison v. Rowan, 3 Wash. C. C. Rep., 580; Ellmaker v. Buckley, 16 S. & R., 72; Floyd v. Bovard, 6 Serg. & Watts, 75; Philadelphia and Trenton Railroad Company v. Stimpson, 14 Peters, 448.

I consider this latter rule as founded on the sounder reason, and as establishing the better practice.

Cross-examination, *ex vi termini*, must relate to what has been stated by the witness on his examination in chief and it could not properly be denominated cross-examination when it extended to new matter about which the witness had given no testimony. Suppose the first witness introduced by the plaintiff testifies only to an isolated fact, as, for example, the execution of a document relied on by the plaintiff as evidence. Would it be competent for the defendant to anticipate the merits of the case to be developed by the plaintiff, and, by way of cross-examination, to examine the witness as to matters which he sup-

posed to be involved in establishing the plaintiff's case, and go into the merits of the whole case? Such a course would scarcely be sanctioned or tolerated by any court. And why? Because it would tend to subvert the regular order of presenting the case, and lead to confusion. And the same principle would seem to apply to the examination of every witness by either party in any stage of the cause; and this is shown by the general rule of practice in the examination of witnesses. That rule is, that the party calling the witness examines him in chief; the adverse party then cross-examines him, and the party calling him then re-examines him, if necessary, for the purpose of explanation of the matters of the previous examination, and he is then dismissed. But if, upon cross-examination, the witness could be examined as to new matter not embraced in his examination in chief, this rule of proceeding must be abandoned. For the party by whom the witness was called would certainly have the right to cross-examine as to the new matter, and the other party would have the right, upon general principles, to re-examine. This would occasion two examinations of the same witness by each party, and the party not calling him would have the closing examination, which is contrary to principle and the established rules of procedure. That principle is, that a party calling a witness and examining him as to a particular matter, takes the affirmative of the matter proposed to be proved by him, and the witness is to be regarded as then introduced and before the court only for that purpose. The cross-examination is by way of response to the special matter proved and for the purpose of disproof or explanation of it. And the same principle which governs the pleadings between the parties should regulate the exhibition of the proof upon the trial. And as each pleading should be strictly in answer to that to which it applies, so the cross-examination of each witness should be confined to the matter testified in his examination in chief, in order to produce certainty and distinctness in ascertaining the facts to be proved.

This course, while it is sanctioned by the rules of logical proceeding, can be productive of no prejudice to a party desiring to prove by the witness other matters than such as are embraced in the examination in chief; for it is well settled that he may

afterwards introduce him as his own witness to prove any matters pertinent to the merits of the cause, and that the adverse party having called him, is thereby precluded from objecting to his competency or from impeaching his credibility.

It is no just objection to this view of the subject that the party, against whom the witness is originally called, should not be compelled to introduce him as his own witness to the new matter, and thereby preclude himself from impeaching his credit. For, if he would rely upon the new matter proved by the witness, it would be against his interest to impeach him, and it is to be presumed that, if he wished to impeach him, he would not introduce him to prove material facts in his case.

In nearly all the cases which are cited in the books to show that a witness called and examined as to a single fact, may be cross-examined as to the whole case, it will be found, on close examination, that they hold merely that, when a witness is examined as to one fact or point in the cause, he is a witness for all purposes pertinent to the issue, *so far as to preclude the party introducing him from discrediting him, or from objecting to him on the ground of interest.* This is the extent of the rule held in Fulton Bank v. Stafford, 2 Wend., 285 ; Varick v. Jackson, ib., 200, 201 ; Morgan v. Bridges, 2 Stark Rep., 314 ; Murrill v. Inhabitants of Berkshire, 11 Pick., 273, 274 ; Webster v. Lee, 5 Mass., 336. And it will be perceived in these and other cases of the same character that the term "*cross-examination*" is used in a very loose and general sense to signify the right of the adverse party to avail himself of the testimony of the witness introduced on the other side generally, and not with reference to the mode in which the testimony of such witness is to be brought out. And none of these cases present the case of an effort, upon cross-examination, to bring out testimony not pertinent to the matter testified to by the witness in his examination in chief.

The case of Moody v. Rowell, above cited, is the only direct adjudication which I have been able to find sustaining that position, and believing it to be not well founded in principle or sustained by authority, I cannot accede to its correctness.

I am therefore of opinion that the ruling of the court below upon this point is correct.